Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 18 2013, 6:27 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**MARIANNE WOOLBERT**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**DOROTHY FERGUSON**
DCS, Madison County Office
Anderson, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE                )
INVOLUNTARY TERMINATION OF THE      )
PARENT-CHILD RELATIONSHIP OF        )
J.F. (Minor Child) and              )
                                    )
D.F. (Father) and S.K. (Mother),    )
                                    )
    Appellants-Respondents,        )
                                    )
        vs.                )    No. 48A02-1211-JT-905
                                    )
INDIANA DEPARTMENT OF CHILD         )
SERVICES,                           )
                                    )
    Appellee-Petitioner.           )

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable G. George Pancol, Judge
Cause No. 48C02-1204-JT-23

**June 18, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

In this case, a young child's medical needs and her parents' instability and mental health issues combined to create circumstances so protracted and complex as to result in the termination of the parent-child relationship. S.K. ("Mother") and D.F. ("Father") appeal the trial court's involuntary termination of their parental relationship with their now five-year-old daughter, J.F., who suffers from leukemia. Because we conclude that the trial court's findings and the record as a whole support the trial court's conclusion that there is a reasonable probability that the conditions that led to J.F.'s removal would not be remedied and that termination is in J.F.'s best interests, we affirm.

**Facts and Procedural History**[1]

On January 26, 2008, J.F. was born to Mother and Father. In December 2010, the Madison County Department of Child Services ("DCS") received a report concerning J.F.'s poor physical condition, Mother's and Father's untreated mental health issues, and unsanitary conditions in the home. Around that time, three-year-old J.F. was hospitalized and diagnosed with acute lethal blastic leukemia. Her medical treatments included eighteen months of monthly in-clinic chemotherapy treatments, daily oral chemotherapy, special dietary restrictions, two to four blood counts per month, close monitoring for fever or other signs of

---

[1] We remind Mother and Father's counsel of the rules regarding the content of both the statement of facts section and the argument section of an appellate brief, i.e., the statement of facts "shall be in narrative form and shall not be a witness by witness summary of the testimony," and the argument section must contain each contention, "supported by cogent reasoning …. [and] citations to the authorities … and the Appendix or parts of the Record on Appeal relied on[.]" Ind. Appellate Rule 46(A)(6)(c), -(8)(a).

infection due to her suppressed immune system, and follow-up appointments post-chemotherapy.

On January 4, 2011, J.F. was removed from the care of Mother and Father. That same day, DCS filed a petition alleging that J.F. was a child in need of services ("CHINS"). Mother and Father stipulated to the CHINS designation, and J.F. was made a ward of DCS. Pursuant to a February 23, 2011 dispositional order, Mother and Father were ordered to undergo a parenting assessment, which gave them a poor prognosis for reunification. According to the assessment, Mother and Father both have mental health issues that require medication, therapy, and monitoring; there is a history of domestic violence between Mother and Father, which Mother minimizes; Father's mental health issues pose a safety risk for J.F. and Mother; Father displays paranoia, and both parents show signs of volatile, aggressive behaviors that impede their ability to make judgments; and Mother and Father do not understand the complexity of J.F.'s medical needs. Mother suffers from schizoaffective disorder and dependence on cannabis and pain medication. Father suffers from schizophrenia, intermittent explosive disorder, and substance abuse and has a history of failing to take his prescribed medications.

In July 2011, Mother and Father appeared in court for a review hearing, and the trial court found that they had not complied with the case plan or with DCS and had not enhanced their ability to fulfill their parenting obligations. In May 2012, DCS filed a petition for the involuntary termination of the parent-child relationship between Mother and Father and J.F.

After conducting evidentiary hearings, on October 11, 2012, the trial court issued an order terminating the parent-child relationship. The factual findings state in part,

4.  On January 4, 2011, [three-year-old J.F.] was removed from the care of [Mother and Father]. DCS had received reports that [Mother and Father] had diagnosed mental health disorders that were affecting their ability to care for [J.F.]. Also reported were unsanitary conditions: cockroaches, gnats, and animal feces in the home. Subsequent to these reports, [J.F.] was diagnosed with leukemia and admitted to Peyton Manning Children's Hospital. Staff reported grave concerns regarding [Mother's and Father's] abilities to feed, medicate, and care for [J.F.] once she was released from the hospital.

    ….

8.  On January 15, 2011, [J.F.] was released from the hospital and placed with her paternal grandparents …. Later, [J.F.] lived in two separate foster placements, her most current being the pre-adoptive home ….

9.  On February 2, 2011, a dispositional hearing was held, whereby the following orders were issued as to [Mother and Father]:

    a.  " … that [they] participate in regular visitation with [J.F.]."

    b.  " … that [they] participate in a parenting assessment and follow any recommendations made from that assessment."

    c.  " … that [they] participate in home-based services and follow any recommendations made from that worker."

    d.  " … that [they] enroll into any programs recommended by DCS pertaining to adult occupational/developmental therapy or a related service."

    e.  " … that [they] meet the medical needs of [J.F.] when [J.F.] can be returned to their care."

    f.  " … that [they] allow announced and unannounced visits into their home by DCS or other service providers."

    g.  " … that [they] complete a mental health evaluation."

4

10. On February 2, 2011, a Petition for Parental Participation was entered by the Court and [Mother and Father] were ordered to participate in the services recommended by DCS.

11. [Mother and Father] failed to successfully complete the services as required in the Dispositional Order.

12. Although [Mother and Father] visited with [J.F.] initially, their visits were stopped due to their lack of emotional control and extreme disregard for the policies of the Children's Bureau. Later, their supervised visits were reinitiated at DCS, but were temporarily suspended for a time when they faced criminal charges for stealing scrap metal.

13. [Mother and Father] did initiate a parenting assessment, but the bonding portion was never completed because they were closed out of supervised visits with [J.F.] at the Children's Bureau.

14. While [Mother and Father] did receive home-based services through the Children's Bureau, they were eventually closed out of those services because Respondent-Father told the home-based worker to never come back to his home or he would call the police. Later, home-based services were reinitiated, but [Mother and Father] failed to show adequate benefit from the services they were offered.

15. Although [Mother and Father] enrolled in the recommended substance abuse programs at Aspire, they failed to successfully complete all of the required meetings.

16. Of the gravest concern is [Mother and Father's] continued failure to demonstrate their ability to dictate [J.F.'s] medication regimen properly. Both parents have received months of careful instruction—from nurses, doctors, psychologists, dieticians, social workers—yet neither parent is able to successfully navigate [J.F.'s] demanding, long-term medical care.

17. [J.F.] is currently placed in a pre-adoptive home.

18. The Family Case Manager believes it is in the child's best interest that parental rights be terminated as the child requires long-term medical care in which the current foster placement can provide and parents cannot provide.

19. The CASA [court-appointed special advocate] believes it is in the child's best interest that parental rights be terminated.

20. DCS has a satisfactory permanency plan for this child, which is adoption.

Appellants' App. at 22-26.

In its conclusions thereon, the trial court specifically cited Mother's and Father's "continued failure to demonstrate their ability to dictate [J.F.'s] medication regimen properly," despite months of in-depth instruction they received from the numerous professionals associated with J.F.'s cancer treatment. *Id*. at 26. The court also specifically noted that "[b]oth parents suffer from mental health issues in which they are not always consistent with [their own] treatment." *Id*. at 27. The court concluded that Mother and Father had "failed to demonstrate that they are ready, willing, and able to care for their child in that they cannot provide for her medical needs"; that there is a reasonable probability that the conditions that led to J.F.'s removal will not be remedied; that there is a reasonable probability that continuation of the relationship poses a threat to J.F.'s well-being; that termination is in J.F.'s best interests; and that there is a satisfactory plan for adoption. *Id*.

Mother and Father appeal the termination order. Additional facts will be provided as necessary.

**Discussion and Decision**

Mother and Father challenge the sufficiency of evidence to support the trial court's judgment terminating their parent-child relationship with J.F. When reviewing a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights,

6

we review for clear error, applying a two-tiered standard of review wherein we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re M.W.*, 943 N.E.2d 848, 853 (Ind. Ct. App. 2011), *trans. denied*. Where, as here, Mother and Father couch their arguments in general terms, challenging the sufficiency of evidence to support the trial court's conclusions without specifically challenging any of the court's findings of fact, we review only to see whether the trial court's unchallenged findings support the judgment. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We neither reweigh evidence nor judge witness credibility. *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*. Rather, we consider only the evidence and inferences most favorable to the judgment. *Id*.

In *Bester*, our supreme court stated,

> The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. A parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. Indeed the parent-child relationship is one of the most valued relationships in our culture. We recognize of course that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. Thus, parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.

*Id*. (citations, quotation marks, and alteration omitted).

To obtain a termination of the parent-child relationship between Mother and Father and J.F., DCS was required to establish:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

7

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)     that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). In recognition of the seriousness with which we address parental termination cases, Indiana has adopted a clear and convincing evidence standard. *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied.*

Mother and Father assert that the evidence is insufficient to support the trial court's conclusion that a reasonable probability exists that conditions that led to J.F.'s removal will

8

not be remedied.[2] When assessing whether there is a reasonable probability that conditions that led to the child's removal will not be remedied, we must consider not only the initial basis for the child's removal, but also the bases for continued placement outside the home. *A.I.*, 825 N.E.2d at 806. Moreover, "the trial court should judge a parent's fitness to care for his [or her] children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* For example, the court may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate housing, history of neglect, and failure to provide support. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). In making its case, "DCS need not rule out all possibilities of change; rather, [it] need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "[A] trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *Castro*, 842 N.E.2d at 372.

---

[2] Mother and Father also challenge the trial court's conclusion that there is a reasonable probability that the continuation of their relationship with J.F. poses a threat to J.F.'s well-being. Indiana Code Section 31-35-2-4(b)(2)(B) requires DCS to prove only *one* of the three circumstances listed. Because we find no error concerning the reasonable probability of unremedied conditions, we need not address the threat to the child's well-being.

9

Here, the conditions that led to J.F.'s initial removal included her illness and special care regimen, Mother's and Father's mental health issues and failure to address those issues, and unsanitary conditions in the home. During the CHINS proceedings, Mother and Father initiated but failed to complete the required services geared toward reunification. To the extent that they cite DCS's failure to provide such services during the termination proceedings, we note that DCS is not required to provide such services during the termination proceedings. *See In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009) (failure to provide services does not serve as basis for direct attack on termination order as contrary to law).

We reject Mother and Father's argument that they were "written off" by DCS due to their mental issues and therefore were not given any opportunities to demonstrate improvement in their parenting skills and in meeting J.F.'s medical needs. Appellants' Br. at 20. With respect to J.F.'s medical needs, unchallenged finding No. 16 states,

> Of the gravest concern is [Mother and Father's] continued failure to demonstrate their ability to dictate [J.F.'s] medication regimen properly. *Both parents have received months of careful instruction*—from nurses, doctors, psychologists, dieticians, social workers—yet neither parent is able to successfully navigate [J.F.'s] demanding, long-term medical care.

Appellants' App. at 25 (emphasis added). To the extent that Mother and Father cite J.F.'s recent health improvements as changed conditions, we note that J.F.'s remission is a condition beyond Mother and Father's control, not a condition that was dependent upon or due to any improvement on their part. Additionally, we note that J.F.'s leukemia has left her with impaired immunities and in a condition requiring careful monitoring for a possible return of the full-blown disease.

10

Moreover, the unchallenged findings and the record as a whole support the trial court's conclusion that Mother and Father were repeatedly afforded opportunities to complete services designed to improve their parenting skills. Even after they had threatened and verbally abused a caseworker assigned to help them with home-based services, the Children's Bureau afforded them another opportunity by reinstituting previously canceled services. Even then, they failed to benefit from the services. They claim that they are now taking their medications and have suitable housing, but they offer no citations to any supporting documentary evidence concerning these assertions, as required by Indiana Appellate Rule 46(A)(8)(a). They simply cannot blame the lack of remedied conditions on DCS, the Children's Bureau, or any of the medical professionals associated with J.F.'s case. The findings support the trial court's conclusion that there is a reasonable probability that the conditions that led to J.F.'s removal will not be remedied.

Mother and Father also challenge the trial court's conclusion that the termination of their parental rights is in J.F.'s best interests. Again, we recognize Mother's and Father's fundamental liberty interests in parenting J.F., but we are also mindful that their parental interests are not absolute, must be subordinated to J.F.'s interests, and may be terminated if they are unable or unwilling to meet their parental responsibilities. *In re G.Y.*, 904 N.E.2d 1257, 1259-60 (Ind. 2009). Although not dispositive, permanency and stability are key considerations in determining the best interests of a child. *Id.* at 1265. A determination of a child's best interests should be based on the totality of the circumstances. *In re A.P.*, 981 N.E.2d 75, 84 (Ind. Ct. App. 2012). With respect to J.F.'s best interests, both the family case

11

manager and the CASA testified that termination was in J.F.'s best interests. Given the trial court's discretion to determine the credibility of evidence, we cannot say that the trial court erred in giving credence to the family case manager's and the CASA's professional opinions regarding J.F.'s best interests. *Id.* at 84-85; *see also In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010 ("the testimony of service providers may support a finding that termination is in the child's best interests.").

Here, the record and findings show a child with a serious illness that requires not only constant attention to her medication administration and dosages, but also to her diet and the cleanliness of her environment. The record and findings also show a mother with a pattern of ingesting substances that impair her mental health and stability, and a father who needs medication in order to maintain mental stability, yet has not consistently followed his own medication regimen.[3] Simply put, Mother and Father can scarcely care for themselves, let alone for a young child with such complex medical needs. While we are sensitive to their love for J.F. and their earnest desire to meet her unusual and complex needs, we nevertheless must subordinate their interests to those of J.F. In short, the evidence and unchallenged findings support the trial court's conclusion that the involuntary termination of Mother and Father's relationship with J.F. is in J.F.'s best interests. To the extent that Mother and Father cite their diligence in seeking the medical treatment that led to J.F.'s leukemia diagnosis in the first place, they simply invite us to reweigh evidence, which we may not do.

---

[3] At the termination hearing, Father's father testified that Father had a twenty-year history of mental health issues and that he would cycle on and off of his medication, i.e., he would take the medication, feel better, think he no longer needed the medication, and then discontinue it. Tr. at 85-86.

Accordingly, we affirm the trial court's judgment.

Affirmed.

ROBB, C.J. and FRIEDLANDER, J., concur.